IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:21-mj-293 |
| | ) | |
| Daquan Joseph **TEAMER**, | ) | |
| Bryanna Messiah **WILLIAMS**, | ) | |
| Ige Moje **WILSON** | ) | **Under Seal** |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT IN SUPPORT OF A**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Bernard Mensah, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I have been a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms,

and Explosives ("ATF") since May of 2017 and am an investigative law enforcement officer of

the United States within the meaning of Title 18, United States Code, Section 2510(7).  I am

empowered by law to conduct investigations and to make arrests for the offenses enumerated in

Title 18, United States Code, Section 2516.  I am currently assigned to the ATF Washington Field

Division's Group V, Crime Gun Enforcement Group (CGEG).  Prior to being assigned to CGEG,

I was assigned to the Firearm Trafficking Group where my assignments included investigating

individuals who were involved in the illegal possession and transfer of firearms, violent crimes

involving firearms, and narcotics and firearms trafficking. Since joining the ATF, I have

successfully completed numerous training programs hosted by ATF, and other local, state, and

federal law enforcement agencies and organizations including the Federal Law Enforcement

Training Center's 12-week Criminal Investigator Training Program and the 14-week ATF Special

Agent Basic Training Program.  I have conducted and participated in electronic surveillance

operations, executed search warrants and arrest warrants, developed sources of information, and conducted international operations that collaborated with foreign law enforcement entities.

2.      I submit this affidavit in support of a criminal complaint and arrest warrant charging Daquan Joseph **TEAMER** (hereinafter "**TEAMER**"), Ige Moje **WILSON** (hereinafter **WILSON**) and  Bryanna Messiah **WILLIAMS** (hereinafter "**WILLIAMS")** with conspiring to make false statements in relation to the purchase of a firearm, in violation of 18 U.S.C. §§ 371, 924(a)(1)(A), and (2), among other crimes.

3.      The facts and information contained in this affidavit are based upon my personal knowledge, observations, training, and experience, and information obtained from other law enforcement officials and witnesses.  All observations I did not personally make were relayed to me by individuals who made them or are based on my review of records, documents, and other physical evidence obtained during the course of this investigation.   This affidavit contains information necessary to support probable cause for this application.  It is not intended to include each, and every fact and matter observed by me or known to the government.

## **PROBABLE CAUSE**

4.      Through my training and experience, I am aware that federal law prohibits federal firearms licensees ("FFLs") from selling a firearm to a non-licensee purchaser "unless the [FFL] records the transaction on a firearms transaction record, Form 4473."  27 C.F.R. § 478.124(a).  I am further aware that the law requires FFLs to retain "as a part of the required records, each Form 4473 obtained in the course of transferring custody of the firearms."  27 C.F.R. § 478.124(a).  Accordingly, any false statement a purchaser makes on a Form 4473 pertains to information an FFL is required by law to maintain.

5.      Law enforcement has been investigating a firearm used in a homicide which was

purchased within the Eastern District of Virginia by WILSON.  As part of this investigation, ATF generally and I specifically have reviewed multiple ATF Form 4473s, Firearm Trace Summaries, video surveillance footage and interviewed Federal Firearm Licensees (FFLs). On or about July 15, 2021, I reviewed an ATF Firearm Trace Summary listing WILSON as the purchaser of a Glock 27, GEN5, .40 caliber pistol bearing serial number BTFA378 (hereinafter "GUN A").  GUN A was recovered with a four (4) day Time to Crime in Washington, D.C. After further analysis through the National Integrated Ballistic Information Network (NIBIN), it was determined that GUN A was used in a homicide in Washington, D.C. two days prior to its recovery. That analysis narrowed the time to first use of the firearm to two (2) days.

6.      GUN A was purchased by WILSON on June 27, 2021, from Silver Eagle Group Inc located in Ashburn, Virginia. Review of Metropolitan Police Department's arrest packet showed that WILSON's firearm was recovered on a party bus in the possession of Jayquan BRYD, Daquan TEAMER (hereinafter "TEAMER") and other associated convicted felons on July 1, 2021.  NIBIN Lead (DC-21-089-535(2)) confirmed that the firearm was used two days later in a homicide on June 29, 2021.

7.      A query of Virginia State Police (VSP) records indicated that within two months, approximately two (2) background checks were conducted at the same Federal Firearm Licensees (FFL) in Ashburn, Virginia for WILSON.  FFL records showed that WILSON purchased two (2) pistols within a two-month period.

8.      I reviewed a copy of an ATF Form 4473 filled out by WILSON for GUN A.  In addition, the FFL provided a receipt of purchase for GUN A, a Glock 17 9mm, 33 round magazine; a ten round Glock 27 magazine; and a 20-count box of Hornady AM Gunner ammunition.  Also included in the packet from the FFL was a Virginia Firearms Transaction Record form filled out

by WILSON and a picture of WILSON's Virginia ID and her listed phone number.  Records show that WILSON provided phone number (571) XXX-2074 to the FFL.

9.      Agents also received a copy of ATF Form 4473 filled out by WILSON on May 12, 2021, for a Springfield XD-9, Sub Compact, 9mm pistol bearing serial number BA232543 (hereinafter, "GUN B").

10.     Upon review of the ATF Forms 4473 from the firearm transfer, it was noted by your affiant that WILSON checked "Yes" in Block 21a, which states "Are you the actual transferee/buyer of the firearm(s) listed on this form?" affirming that she was the actual transferee/buyer of the firearm listed on line 1.  Block 22 of each ATF Form 4473 was signed by WILSON, certifying that her answers were true, correct, and complete.

*Review of Video Surveillance Footage from Straw Purchase*

11.     On July 20, 2021, I reviewed security video footage from Silver Eagle Group FFL in Ashburn, Virginia, from June 27, 2021.  The footage showed WILSON purchasing GUN A. She was accompanied by an unidentified black male throughout the process of choosing the firearm.  The individual accompanying WILSON was later determined to be TEAMER.

12.     At approximately 2:15 PM, WILSON (wearing blue jeans, and a black and tan abstract colored shirt) and TEAMER (wearing light ripped jeans, white t-shirt, black and green sneakers, a brown print designer baseball cap and a black satchel with a red and black strap) enter the front door of Silver Eagle Group FFL.  At approximately 2:33 PM, the couple walked to the handgun display area and immediately started browsing for firearms.

13.     TEAMER is observed texting on his phone while looking at firearms.  The couple appeared to be making conversing while browsing the firearm display.  At approximately 2:35 PM, WILSON asked a store employee for a specific firearm and then referenced her cell phone.

TEAMER continued to vigorously text while WILSON manipulated the pistol. Based on my training and experience, it was apparent that WILSON was not familiar with firearms. She manipulated the firearm in an awkward and unorthodox manner, nearly looking down the barrel of the pistol during her manipulation. In addition, she only manipulated the firearm for approximately 8 seconds before agreeing to purchase it.

14.     Immediately after manipulating the firearm, WILSON is seen completing the ATF FORM 4473 on the FFL's computer. TEAMER disappeared and was no longer seen with WILSON throughout the rest of the transaction.

15.     After completing the forms, WILSON is seen paying for the firearm in cash at the payment counter. Once she received the firearm and ammunition, WILSON then leaves the FFL by herself at approximately 3:29 PM. Law enforcement determined that the same ammunition used in the homicide was the same ammunition purchased by WILSON.

*Interview of WILSON*

16.     On August 2, 2021, MPD Detective David Evans and I interviewed WILSON. Agents travelled to WILSON's apartment located at 1003 S Frederick Street, Apt XXXX, Arlington, VA. WILSON requested not to speak to agents inside her apartment because her three children were present. WILSON agreed to voluntarily speak with agents inside my vehicle.

17.     I began the interview by asking WILSON about GUN B. When asked about the whereabouts of GUN B, WILSON immediately stated that she sold it to her friend "Brian," who currently lived in Washington, D.C. and was still in possession of the pistol. WILSON stated that she kept the firearm for approximately 60 days before selling it to "Brian." When asked how much she sold the pistol for, WILSON replied, "$350." When asked why she sold the pistol to "Brian" for less money than she bought it for, WILSON stated that she and "Brian" were close friends and

dated each other for approximately a year and a half, therefore, she did not mind selling the pistol at a loss.  WILSON later stated that "Brian" went by the name "Fats" and lived around Good Hope Road, SE, Washington, D.C.

18.     When asked if "Fats" was a felon, WILSON said she was not sure but knew he had been to jail.  WILSON stated that she would get GUN B back from "Fats."

19.     When asked what "Brian's" last name was, WILSON did not know.  Detective Evans asked for a contact number for "Brian," WILSON stated she did not communicate with him via phone, they only communicated through Instagram Direct Messaging. Detective Evans requested their Instagram user names and WILSON said "Brian's" Instagram handle was "Tayy Davis," and hers was "Thatfineassgeegee."

20.     When asked about GUN A, WILSON initially told agents that the pistol was stolen from her vehicle in Washington, D.C. on July 2, 2021.  GUN A was recovered by law enforcement on July 1, 2021, in Washington, D.C.  WILSON attempted to report the firearm stolen to Arlington Police Department, even though it was allegedly stolen in D.C.

21.     WILSON forwarded the Arlington Police inquiry email, related to the alleged stolen firearm, to my email.  WILSON said she did not want to purchase any additional firearms until the situation with the stolen pistol was finalized.  WILSON stated that she did not purchase the pistols for protection, instead, the pistols were purchased to hunt.

22.     I explained to WILSON that lying to a federal agent is a federal offense and encouraged WILSON to be forthcoming.  When questioned about who asked her to purchase GUN A, WILSON stated that an individual known to her as "Bobby," asked her to purchase the pistol for him.  WILSON told agents she did not know "Bobby's" real name and that she met him through her best friend Bryanna WILLIAMS (hereinafter "WILLIAMS") who facilitated the entire

scheme. WILSON identified "Bobby" as **TEAMER**, through photograph, at MPD homicide division.

23.     **TEAMER** was convicted of Attempted Assault with a Deadly Weapon and Unlawful Possession of a Firearm in 2019.  **TEAMER** was also convicted of Carrying a Pistol without a License in 2018 in Washington, D.C. When asked if she knew **TEAMER** was a convicted felon, WILSON said she did not know, but suspected that **TEAMER** was affiliated with criminal activity and street life.

24.     WILSON said **TEAMER** initially asked WILLIAMS to purchase the firearm, but WILLIAMS declined and then prompted WILSON to purchase the firearm. WILSON said **TEAMER** texted WILLIAMS to initiate the scheme, but WILLIAMS persuaded her to buy. WILSON stated that WILLIAMS, **TEAMER**, and herself drove WILLIAMS' rental car to the gun store.  WILLIAMS stayed in the vehicle while WILSON and **TEAMER** purchased the firearm.  WILSON admitted to agents that **TEAMER** picked out the pistol at the gun store while communicating through text message with WILLIAMS and other unknown co-conspirators. WILSON also said the three of them communicated throughout the firearm purchase through group text and separate individual text conversations. WILSON said that once the firearm was picked out by **TEAMER**, he disappeared and left her in the store to complete the necessary documents and take possession of the firearm.

25.     WILSON stated that **TEAMER** most likely sold marijuana.  WILSON told agents that she regularly smoked marijuana and often bought weed from **TEAMER**'s friends. WILSON stated that **TEAMER** and his associates called themselves, "The Rich Nxxxxx."

26.     WILSON stated that **TEAMER** gave her all the money to purchase the firearm and provided an additional $400 for her straw purchase.  When asked if WILSON needed the

money, WILSON replied yes, and said she needed the money at the time because her car had recently broken down.

27.     When asked where **TEAMER** and his associates congregated, WILSON responded, Pennsylvania Avenue in Washington, D.C.  WILSON said she did not hang around the group much because she had children and did not want to get into any trouble.  WILSON stated that WILLIAMS, **TEAMER**, and their associates are always in "Sticky situations."  When asked if **TEAMER** or WILLIAMS sent her any pictures of firearms through the phone, WILSON said no because WILLIAMS was street smart and would not do such a thing.  She stated that WILLIAMS knew how to evade law enforcement detection and circumvented self-implication.

28.     WILSON showed me her text messages and FaceTime conversations with WILLIAMS.  While browsing her phone, I asked if she was forced to purchase the firearm for **TEAMER**, WILSON said no.  She stated that she was pushed and pressured to purchase the firearm for them but was not forced.

29.     I showed WILSON screenshots from the video surveillance footage at Silver Eagle Group on June 27, 2021.  WILSON confirmed the individual who accompanied her into the gun store was **TEAMER**.  WILSON also confirmed her identity in the pictures.

30.     At this stage of the interview, I explained to WILSON that her phone needed to be seized and downloaded pursuant to the investigation.  WILSON agreed to a consensual search and download of her phone. WILSON stated, "I will gladly give you consent. Can I just grab a few phone numbers out of it? …I don't feel bullied, or I don't feel like you guys are trying to give me a hard time."  Agents wrote down the numbers WILSON requested and handed her the paper with the numbers.  WILSON also voluntarily provided her passcode for the cellphone.

31.     Prior to asking for consent, I asked if there were any conversations related to other criminal activity and firearms trafficking in the phone.  WILSON said there was not.

32.     At approximately 12:27 PM, I presented WILSON with ATF Form 3200.4, Advice of Rights and Waiver.  I read her Miranda Rights out loud, and WILSON acknowledged that she understood her rights and was willing to speak to agents without a lawyer present.  After signing, acknowledging, and waiving her rights, WILSON summarized and elaborated on the circumstances surrounding the acquisition of the firearm on June 27, 2021.

33.     Agents asked WILSON to assist MPD's homicide investigation involving her Glock pistol.  WILSON agreed and at approximately 1:30 pm, WILSON and the agents arrived at MPD Homicide Unit where she was interviewed by Detective Jeffery Clay.

*Seizure of GUN B from WILSON*

34.     On August 3, Detective Evans and Special Agent Lipsky seized GUN B from WILSON**'**S residence.  Prior to the seizure, WILSON arrived at the ATF'S Washington Field Office to retrieve her cell phone which had finished being downloaded. While she was in the office, she mentioned to Detective Evans she saw "Fatz" at the 7-Eleven located at 1918 14th Street SE, Washington, D.C. (the corner of 14th St SE and Good Hope Road).

35.     According to WILSON, she told "Fatz" she needed to get the firearm back from him because he never completed the paperwork for transferring the firearm. WILSON drove to "Fatz" apartment and retrieved the firearm which she had previously sold to him.  She transported the firearm to her residence and locked it in her dresser.

36.     At approximately 1338 hours, Detective Evans and Special Agent Lipsky arrived at WILSON'S residence to seize the firearm.  Special Agent Lipsky requested to

obtain the firearm from the dresser for safety precautions and to reduce the amount of DNA contaminants transferred to the firearm.  WILSON agreed, directed Detective Evans and Special Agent Lipsky to the dresser and provided the key to unlock the drawer.  She claimed she kept the firearm in the same grocery bag in which "Fatz" provided.

### Review of WILSON's Cellphone Pursuant to Consensual Search and Download

37.     On August 6, 2021, I reviewed a cell phone download for WILSON's iPhone 12 attached to AT&T telephone number 571-XXX-2074 (hereinafter referred to as the "device").

38.     I reviewed the records for the device, which revealed pertinent information related to straw purchasing firearms via text messages (SMS/MMS), iMessages, Instagram Direct Messages and Chats. The below listed information is categorized into the specific conversations extracted from the device.

39.     On June 27, 2021, the device showed a conversation between phone number 240-XXX-5105 (**TEAMER** aka "Bobby"), and the device related to the straw purchase of a GUN A.  Along with the firearm, the purchase of ammunition and extended magazines were also discussed.

40.     **TEAMER** texted "Yea they got the leg…You see it…This dice…See if that leg can go w the gun…Ask em…Aye get this Glock 17 33rd magazine…For 2wop." WILSON replied**,** "Ite."  **TEAMER** then texted, "Get a lot of amo too…Like 1 box 2 boxes."  WILSON replied, "I got it. Lol."  **TEAMER** texted, "Ok."

41.     On JULY 10, 2021, WILSON texted, "I need za. Way?" **TEAMER** responded, "28."

42.     Based on my training and experience, I know the term "Leg" to be common street terminology for an extended magazine for a pistol.  Furthermore, this conversation corroborates WILSON**'s** interview and admission of straw purchasing the GUN A for **TEAMER**. I also know the term "Za" to be common street terminology for exotic marijuana.  According to intelligence gathering and interviews, **TEAMER** and his associates congregate on or around 28th street in Washington, D.C."

43.     Also on June 27, 2021, during the purchase of GUN A, WILLIAMS texted WILSON from phone number 202-xxx-7383.  WILLIAMS' contact was saved in the device as -BraceFace.  WILLIAMS texted, "How much is the 30 clip ?"  WILSON replied, "Ima ask hold on."  WILLIAMS texted, "He said get a beam and leg."  WILSON responded, "Bruh I'm about to come out."  WILLIAMS texted, "Yu think somebody boutah leave yu and bobby."  WILSON texted, "No fr and Bobby making me look sketch."  WILLIAMS texted, "Smh he need to come out."  WILSON responded, "Exactly but it might look weird if he leave…Never again…Then he keep asking for all this shit like bruh…I don't know what half of this shit is."  WILLIAMS texted, " 😒 even cinco was like he look like he was ina candy store."  WILSON responded, "I asked about the clip and he looked at me like I was dumb…And my girl in here looking at me like are you buying this for him."

44.     On July 1, 2021, WILSON texted **TEAMER**, "Happy Bobby day. 😁 🎉 🎊."

45.     Also on July 1, 2021, WILLIAMS, WILSON**,** and an unidentified individual named "Twinn" held a group text conversation.  WILLIAMS texted, "Ok bobby just called me im boutah come there."  WILSON replied, "Yeah I wasn't at first but I guess I'll come out for that lil bitch Bobby."  TWINN texted the group, "Man I think they got locked twin

👤.”  WILSON replied, “WHAT!”  TWINN texted, “Juss got a call saying they got locked

up… Bre juss said she talking him she called and hung up.”  WILLIAMS responded, “He

in there.”

46.     On July 2, 2021, WILSON texted WILLIAMS, “Just finished talking to 40.

👤.”  WILLIAMS responded, “I love you we gunna get thru it.”

47.     After the recovery of GUN A on the party bus with TEAMER on July 1,

MPD conducted a search of the bus, which resulted in multiple firearms.  On July 2, 2021,

WILSON attempted to report the firearm stolen at the direction of WILLIAMS.

48.     In an INSTAGRAM conversation between “Derek Anthony Howard and

WILSON on July 2, 2021, Derek Anthony Howard wrote, “Anything you need Nigga I

gotchu… ANYTHING… THE BEST.”    WILSON responded, “Ok Brodie.”   Derek

Anthony Howard wrote, “Delete all these messages though.”  WILSON replied, “Got you.”

49.     In a text message on July 2, 2021, WILLIAMS sent WILSON,

“https://police.arlingtonva.us/online-police-reporting-system/” (The website used to falsely

report GUN A stolen to Arlington Police).

50.     Further review of the device uncovered a text message conversation between

WILLIAMS and WILSON related to the purchase of GUN B. On May 12, 2021,

WILLIAMS texted, “Springfield xd 9… If you dont have enough for shells then dont get

em just get the joint.” WILSON replied, “Ight.” As mentioned earlier, GUN B was

purchased on May 12, 2021 from Silver Eagle Group Inc.

<u>Interview of WILLIAMS</u>

51.     On August 10, 2021, Special Agent Rebekah Lipsky, Detective David

Evans, and I interviewed WILLIAMS in relation to a firearm purchased from Silver Eagle

Group FFL and subsequently used in a homicide in Washington, D.C. two days later.

52.     Agents travelled to WILLIAMS' residence located at 2XXX S Lowell Street, Arlington, VA.  I approached WILLIAMS as she exited her residence and walked to her rented Zip Car.  Agents offered to conduct the interview in their vehicle to afford WILLIAMS privacy from her grandparents and neighbors. WILLIAMS agreed and asked agents to enter her vehicle instead. WILLIAMS drove approximately two houses up from her house and instructed agents to enter her vehicle.  I sat in the front passenger seat while Special Agent Lipsky and Detective Evans sat in the backseat for the interview.

53.     I began the interview by asking WILLIAMS about her involvement with the straw purchase of GUN A.  WILLIAMS stated that she was only the passenger when WILSON and **TEAMER** travelled to Silver Eagle Group FFL.  WILLIAMS stated it was her Zip Car rental, but WILSON was the one who drove.  I challenged her claim that she was just a passenger.

54.     I showed WILLIAMS copies of four (4) ATF Form 4473s completed by WILLIAMS at 50 West Armory in Chantilly, VA, and Silver Eagle Group FFL in Ashburn, VA.  WILLIAMS acknowledged that she purchased all four pistols at FFLs located in the Eastern District of Virginia.

55.     On March 20, 2021, WILLIAMS purchased a Glock, 43X, 9mm pistol bearing serial number BSMT661 (hereinafter "GUN C") from Silver Eagle Group.

56.     On May 3, 2021, WILLIAMS purchased a Glock 27 Gen 5, .40 caliber pistol bearing serial number BPAK265 (hereinafter "GUN D") from Silver Eagle Group.

57.     On June 4, 2021, WILLIAMS purchased a Smith and Wesson, Bodyguard .380 caliber pistol bearing serial number KHY1200 (hereinafter "GUN E") from 50 West

Armory.

58.     On July 16, 2021, WILLIAMS purchased a Taurus, GX4, 9mm pistol bearing serial number 1GA02823 (hereinafter "GUN F") from Silver Eagle Group.

59.     When asked where the firearms were, WILLIAMS stated, "The 27 is in my house and these… honestly I think they were stolen…"  WILLIAMS stated that she stored the other firearms at her friend, Jordan Jermaine WYATT's aka "Cinco" house in Reston, Virginia.  WILLIAMS stated that she tried to recover the firearms from WYATT, but he was not responsive to her phone calls and text messages.

60.     WILLIAMS stated that she did not keep all her firearms because her grandfather was a "white guy" who did not like drama in the house.  WILLIAMS stated that she did not want to cause any issues for her grandparents and wanted to cooperate with agents in recovering the firearms.  At this stage of the interview, I instructed WILLIAMS to recover the Glock 27 bearing serial number BPAK265 from her residence. Before doing so, I requested a consensual search of her phone. WILLIAMS gave agents consent to search her cell phone pursuant to the investigation.

61.     After realizing that WILLIAMS had straw purchased these firearms for individuals, I explained to WILLIAMS that lying to a federal officer was a crime and encouraged her to be forthcoming.  WILLIAMS admitted that she initially lied about the whereabouts of the firearms and agreed to be honest moving forward.

62.     WILLIAMS stated that she purchased the Glock 43X for WYATT while he was in the process of moving from Washington, D.C. to Reston, Virginia.  She stated that WYATT moved to Virginia to get a gun license.  When asked how much WYATT paid for the straw purchase, WILLIAMS stated that WYATT paid $250.  Later in the interview,

WILLIAMS admitted that WYATT was a fraudster and bank scammer.

63.    WILLIAMS stated that the Smith and Wesson .380 pistol and the Taurus GX4 pistol were purchased for her friend, "Rico" aka Tyreik ROGERS. WILLIAMS stated that ROGERS lived in Columbia, Maryland but spent time in Washington, D.C. WILLIAMS described ROGERS as "Cookies and Cream. A black boy with freckles". Detective Evans showed WILLIAMS a picture of an unidentified male and WILLIAMS responded, "Ricky Pooh" and identified the individual in the picture as ROGERS. WILLIAMS stated that WILSON had relations with ROGERS, that's how WILLIAMS met ROGERS.

64.    WILLIAMS stated that ROGERS paid approximately $280 for the straw purchase of the Smith and Wesson, Bodyguard, .380 pistol. He also paid approximately $400 for the Taurus GX4 pistol. WILLIAMS stated that she paid for the firearms with her own money and was reimbursed by ROGERS after. WILLIAMS stated that WILSON went with her to the FFL to purchase the firearms. Later in the interview, WILLIAMS stated that "They" gave her money for the Taurus pistol.

65.    When asked where she recovered the Glock 27 from, WILLIAMS stated that "Damo" was in possession of the Glock 27 before WILLIAMS recovered it and brought it back to her residence. WILLIAMS stated that "Damo" lived on 16th and V street, SE, Washington, D.C. WILLIAMS stated that she purchased the Glock 27 for herself but allowed "Damo" to hold it.

66.    At this stage of the interview, Special Agent Lipsky and WILLIAMS exited the vehicle and walked to her house to recover the Glock 27 pistol. When she returned to the vehicle, WILLIAMS acknowledged the ATF Form 3220.11, Consent to Search for a

consensual search of her blue, iPhone 12.  WILLIAMS also provided her passcode.

Agents accompanied WILLIAMS to return her Zip Car in Washington, D.C.

67.     At approximately 12:15 PM, Detective Evans and I continued the interview

at ATF D.C. Field Office located at 90 K. Street, Washington, D.C.  Prior to questioning,

at approximately 12:20 PM, I presented WILLIAMS with ATF Form 3200.4, Advice of

Rights and Waiver.  I read her Miranda Rights out loud, and WILLIAMS acknowledged

that she understood her rights and was willing to speak to agents without a lawyer present.

WILLIAMS also signed the Consent Form discussed earlier.  After signing,

acknowledging, and waiving her rights, WILLIAMS summarized and elaborated on the

circumstances surrounding the firearm investigation.

68.     WILLIAMS stated that WILSON alerted her that law enforcement would

approach her.  WILLIAMS stated that WILSON alerted her to the homicide involving her

straw purchased pistol.  WILLIAMS admitted to communicating with **TEAMER** during

the purchase of GUN A.  WILLIAMS stated that she was in a relationship with **TEAMER**

and introduced WILSON to **TEAMER**.

69.     I showed WILLIAMS a picture of an unidentified male and WILLIAMS

stated, "That's him!"  WILLIAMS identified the individual in the picture as WYATT.

70.     WILLIAMS elaborated on "Damo's" description.  Agents were able to

identify "Damo" as convicted felon, Damien Mickhel DYSON.

71.     WILLIAMS stated that she bought firearms for ROGERS because she

wanted to help him out.  ROGERS texted WILLIAMS and requested those specific

pistols.  After purchasing the firearm, WILLIAMS stated that she took the firearm to his

house in Maryland the next day.  WILLIAMS stated that DYSON and ROGERS knew

each other.

72.     WILLIAMS admitted to deleting messages and communications after speaking to WILSON.  WILLIAMS provided social media access to her co-conspirator's Instagram accounts.

<u>Review of WILLIAMS' Cellphone Pursuant to Consensual Search and Download</u>

73.     On August 10, 2021, I conducted a preliminary search of WILLIAMS' cellphone.  It was evident to agents that there were numerous deleted text messages and data from her cellphone.  Agents discovered two voice memo recordings on WILLIAMS' cellphone discussing details surrounding the straw purchase, arrest of co-conspirators and the recovery of GUN A.

74.     In a conversation between WILSON and WILLIAMS captured on WILLIAMS' cellphone, WILSON is heard rehearsing the lie she told to me regarding the theft of GUN A.  WILLIAMS is heard corroborating and encouraging her story.  The ladies continued to discuss their discontent with how **TEAMER** and his acquaintances were apprehended with GUN A on July 1, 2021.  WILLIAMS specifically stated that **TEAMER** and his associates put her and other unidentified co-conspirators in jeopardy with law enforcement.  WILLIAMS admitted to creating the recordings during her interview with agents on August 10, 2021.

<u>Review of WILLIAMS' Cellphone Images</u>

75.     Further review of WILLIAMS' cellphone revealed numerous photographs and conversations related to firearms trafficking, drug use and other criminal activity.

76.     WILLIAMS photographed an images of receipts for the purchase of GUN F and GUN D.









77.     In another image captured by WILLIAMS' cellphone, an image of GUN

E's gun box displaying the serial number of GUN E is displayed.



78.     In another image WILLIAMS' device captured a handwritten ledger of

**TEAMER** and his social security number.



79.     Another image from WILLIAMS' device shows the rental car confirmation

for June 26, 2021, to June 29, 2021 when GUN A was purchased.  The vehicle was rented

from Dulles Airport.  This image corroborates WILLIAMS' admission during her

interview with law enforcement.



80.    In another image captured in WILLIAMS' cellphone, an image of GUN B, purchased by WILSON is stored in the phone.



81.     An additional image of a Facetime screenshot of WILLIAMS talking to

WYATT showed WYATT holding a firearm while displaying a large amount of money on

the counter.



82.    In addition to the images corroborating the known straw purchases conducted by WILLIAMS and WILSON, WILLIAMS also captured numerous pictures of firearms.  Based on my training and experience, the activity, images, text messages and patterns displayed in WILLIAMS' cellphone depicts behavior related to firearms trafficking.











Threats Towards WILSON

83.     On August 11, 2021, MPD Detective James O'Bannon and I interviewed

WILSON in relation to potential threats she received for cooperating with law

enforcement.  Prior to the interview, WILSON called me in tears because she observed

threatening language directed at her on social media and heard rumors that "people from

the streets" were looking for her.

84.     I asked WILSON about her safety concerns, and she stated that she saw

comments on Instagram saying she was "hot."  Her friends and acquaintances were telling

others that WILSON cooperated with law enforcement, therefore, no one should trust her.

When asked if she told anyone that she spoke to law enforcement, WILSON said she only

told WILLIAMS.  WILSON stated that WILLIAMS was the only person who could have

informed those involved in the trafficking and homicide investigation.

85.     WILSON stated that social media comments did not concern her, but she

became worried when her son's aunt called to warn her.  WILSON said her son's aunt,

"Chanelle", who she had not spoken to in years, called to ask WILSON if she should take

WILSON**'s** children out of precaution.  WILSON was concerned because her son's aunt

was unaware of the investigation and unaffiliated with the people under investigation.

WILSON stated that she was a stripper in Washington, D.C., therefore, she came across a

variety of random people.  WILSON thought it was odd and alarming for Chanelle to

receive such information.

86.     WILSON stated that no one affiliated with the investigation had reached

out to her since she last spoke to WILLIAMS.  When asked who from the crew would

harm to her, WILSON stated that **TEAMER** and an individual named, "40/Forty" would

not hesitate to shoot her.

87.     I showed WILSON a picture of an individual law enforcement suspected to

be "40/Forty" and WILSON positively identified the person in the picture as "40/Forty"

aka, Shaka HALTIWANGER. WILSON reiterated that **TEAMER** or HALTIWANGER

would not hesitate for a second to shoot her.  WILSON stated that **TEAMER** and

HALTIWANGER would be more favorable to WILLIAMS.

88.     I told WILSON to call 911 if she was in any imminent danger.  I also told

WILSON to call him, MPD Detective Clay, or Special Agent Lipsky after calling 911 or if

she gathered any further information on direct threats.

89.     That night, I received a phone call from WILSON**,** and she confirmed that

WILLIAMS was the individual perpetuating the threats against WILSON.  According to

WILSON, WILLIAMS told friends, acquaintances, and co-conspirators that WILSON was

cooperating with law enforcement regarding the firearm trafficking investigation.

90.     With the newly acquired information, I immediately called WILLIAMS

and told her to immediately cease any threats of violence and rumors towards WILSON.

Before I could finish his sentence, WILLIAMS interrupted and stated, "Aint nobody

gonna do nothing to that girl."  I explained to WILLIAMS the severity and sensitivity of

the investigation and warned WILLIAMS not to take the matter lightly.

91.     WILLIAMS stated that she would keep the chatter off the internet.  I

commanded WILLIAMS to stop the chatter in its totality.  Along with social media, I also

commanded WILLIAMS to stop texting and talking about the investigation to unknown

and known conspirators. Due to the circumstances, I explained to WILLIAMS that she would be considered a suspect if any harm or violence was committed against WILSON.

92.     WILLIAMS agreed and apologized for her involvement in perpetuating threats towards WILSON.  WILLIAMS agreed to cease any additional chatter about WILSON**'s** involvement in the case.

93.     I contacted MPD Detective Clay, and we decided to document the situation and reevaluate the need for witness protection.

## CONCLUSION

94.     Based upon the foregoing, I submit there is probable cause to believe that between March 2021 and August 2021, within the Eastern District of Virginia, Daquan Joseph **TEAMER,** Ige Moje **WILSON** and  Bryanna Messiah **WILLIAMS** conspired to make false statements in relation to the purchase of a firearm, in violation of Title 18, United States Code, Sections 924(a)(1)(A) and 2 (knowingly making a false statement in relation to the purchase of a firearm), § 922(a)(5), and 2 (transfer of firearm to another person without license) among other crimes.

Respectfully submitted,

*Bernard C. Mensah*

Bernard Mensah
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to in accordance with
Fed. R. Crim. P. 4.1 by telephone on August 24, 2021:

_____
The Honorable Ivan D. Davis
United States Magistrate Judge